[No. 53764-4-I. Division One. September 27, 2004.]

MONICA L. MCDOWELL ELVIG, *Appellant*, v. WILL ACKLES, ET AL., *Respondents*.

---

[56] *Bankes*, 114 Wn. App. at 289.

[57] *Bankes*, 114 Wn. App. at 289.

[58] *Pens v. Bail*, 902 F.2d 1464, 1466 (9th Cir. 1990).

492

*Judith A. Lonnquist* (of *Law Offices of Judith A. Lonnquist, P.S.*), for appellant.

*Elizabeth K. Reeve* (of *Reeve Shima, P.C.*), for respondents.

AGID, J. — Reverend Monica L. McDowell Elvig (Elvig) appeals a trial court's order dismissing her sex discrimination case against the Calvin Presbyterian Church, the North Puget Sound Presbytery, and two Presbyterian ministers. She argues that a church and its employees are not immune from civil liability simply because they are religious entities. But because adjudicating Elvig's case would require a civil court to impermissibly examine decisions made by a church tribunal, we must affirm.

## FACTS

Reverend Elvig is an ordained Presbyterian minister who, beginning in December 2000, worked as an associate minister at Calvin Presbyterian Church (church). Reverend Will Ackles (Ackles), also an ordained minister, was the church's senior minister. According to Elvig, Ackles began making unwelcome sexual advances toward her shortly after she began her service at the church. These advances included frequent comments about her appearance and suggestive gestures and remarks. In June 2001, Elvig reportedly confronted Ackles, but Ackles denied her accusations. Shortly thereafter, Ackles allegedly retaliated against Elvig by taking away her preaching assignments and expressing doubt about her continued employment. Ackles also allegedly made defamatory remarks about Elvig. Elvig then left the church.

Elvig filed with the church a written statement accusing Ackles of sexual misconduct. The church referred the state-

ment to an Investigating Committee (Committee) composed of members from a different Presbyterian church. The Committee conducted a fact-finding inquiry and concluded that charges would not be filed against Ackles. Elvig appealed this decision to the Permanent Judicial Commission of the Presbytery (Commission), the highest Presbyterian adjudicatory body. The Commission affirmed the Investigating Committee's decision.

In October 2001, Elvig filed an Equal Employment Opportunity Commission (EEOC) charge of discrimination against the church and the North Puget Sound Presbytery (presbytery).[1] In December 2001, the EEOC concluded that Elvig failed to establish a civil rights violation. That same month, the presbytery voted to dissolve Elvig's pastoral relationship with the church. In January 2002, Elvig sought permission from the presbytery's Committee on Ministry (COM) to seek other ministerial positions.[2] But COM officials allegedly told Elvig that she could not look for another job until she resolved her issues with the Calvin Presbyterian Church. Later that month, the COM notified Elvig that it would not permit her to circulate her resume at that time.

After receiving right-to-sue letters from the EEOC, Elvig filed a civil action in federal court. The United States District Court in the Western District of Washington dismissed the case on the grounds that considering the claims would improperly entangle the court with the church's ecclesiastical decision-making process. The Ninth Circuit Court of Appeals reversed and remanded, holding that the portions of Elvig's claims that involved a church's freedom to make employment decisions about its ministers were precluded, but that her remaining claims could proceed.[3]

---

[1] A presbytery oversees churches and ministers within its geographical region. The Calvin Presbyterian Church is part of the North Puget Sound Presbytery.

[2] Presbyterian Church rules require a minister to obtain permission before seeking ministerial positions at other Presbyterian churches.

[3] *Elvig v. Calvin Presbyterian Church*, 375 F.3d 951 (9th Cir. 2004).

Upon the dismissal of her case from the federal district court, Elvig filed this action. She is suing: (1) Will Ackles for sexual harassment, retaliation, aiding and abetting, and defamation; (2) Terry Nelson, the Executive Presbyter of the North Puget Sound Presbytery, for retaliation and aiding and abetting; (3) the church for retaliation and negligent supervision; and (4) the presbytery for retaliation, aiding and abetting, and negligent supervision. The defendants moved to dismiss on a variety of grounds. Without specifying its reasons, the trial court dismissed all causes of action except the defamation count. Elvig then voluntarily nonsuited the defamation count, and the court dismissed it without prejudice. Elvig requested direct review by the Washington Supreme Court, but the court denied the request and transferred the case here.

## DISCUSSION

Ackles, Nelson, the church, and the presbytery (collectively respondents) moved to dismiss this case on the grounds that the court lacked subject matter jurisdiction and that Elvig failed to state a claim for which relief could be granted. Because the respondents filed declarations in support of their motion, the trial court treated the motion as one for summary judgment.[4] In reviewing a trial court's decision to grant summary judgment, we consider all facts and reasonable inferences in the light most favorable to the nonmoving party.[5] Absent a genuine issue of any material fact, the moving party is entitled to summary judgment as

---

[4] *See* CR 12(b) ("If, on a motion . . . to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in rule 56 . . . .").

[5] *Mason v. Kenyon Zero Storage*, 71 Wn. App. 5, 8-9, 856 P.2d 410 (1993).

a matter of law.[6] This case raises questions of law, which we review de novo.[7]

■ Respondents argue that the United States Constitution's First Amendment prohibits a civil court from adjudicating this action because it is an internal church dispute on which an ecclesiastical judicial body has already ruled. In Washington, civil courts may adjudicate church-related disputes only if the dispute does not involve ecclesiastical or doctrinal issues.[8] "The First Amendment does not provide churches with absolute immunity to engage in tortious conduct. So long as liability is predicated on secular conduct and does not involve the interpretation of church doctrine or religious beliefs, it does not offend constitutional principles."[9] But if the church accused of wrongdoing is a member of a hierarchically-organized church that has ecclesiastical judicial tribunals, civil courts must defer to the highest church tribunal's resolution of the matter, despite the fact that the dispute could be resolved by a civil court.[10]

In addition, civil courts may not adjudicate matters involving a church's selection of its spiritual leaders. This "ministerial exception" is a constitutionally-derived exception to civil rights legislation that "insulates a religious organization's employment decisions regarding its minis-

---

[6] *Condor Enters., Inc. v. Boise Cascade Corp.*, 71 Wn. App. 48, 54, 856 P.2d 713 (1993) (citing CR 56(c); *Marincovich v. Tarabochia*, 114 Wn.2d 271, 274, 787 P.2d 562 (1990)).

[7] *Mains Farm Homeowners Ass'n v. Worthington*, 121 Wn.2d 810, 813, 854 P.2d 1072 (1993).

[8] *Gates v. Catholic Archdiocese of Seattle*, 103 Wn. App. 160, 166-67, 10 P.3d 435 (2000) (citing *Org. for Preserving Constitution of Zion Lutheran Church of Auburn v. Mason*, 49 Wn. App. 441, 445, 743 P.2d 848 (1987); *Southside Tabernacle v. Pentecostal Church of God, Pac. N.W. Dist., Inc.*, 32 Wn. App. 814, 817, 650 P.2d 231 (1982)), *review denied*, 142 Wn.2d 1026 (2001).

[9] *C.J.C. v. Corp. of Catholic Bishop of Yakima*, 138 Wn.2d 699, 728, 985 P.2d 262 (1999) (citing *Sanders v. Casa View Baptist Church*, 134 F.3d 331, 336 (5th Cir.), *cert. denied*, 525 U.S. 868 (1998)).

[10] *Mason*, 49 Wn. App. at 447-48 (citing *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 20 L. Ed. 666 (1871)).

ters from judicial scrutiny . . . ."[11] It applies "when the disputed employment practices involve a church's freedom to choose its ministers or to practice its beliefs."[12] We implicitly adopted this exception in *Gates v. Catholic Archdiocese of Seattle*.[13] There, we stated that secular courts must avoid controversies between a church and its minister "because the 'introduction of government standards to the selection of spiritual leaders would significantly, and perniciously, rearrange the relationship between church and state.' "[14]

In sum, a civil court may adjudicate Elvig's claims only if: (1) liability would be based on secular conduct and would not require the court to interpret church doctrine or religious beliefs; (2) an ecclesiastical tribunal of a hierarchically-structured church has not already resolved the matter;[15] and (3) Elvig's claims do not involve a church's ability to choose its ministers.

■ Elvig's retaliation, aiding and abetting, and negligent supervision claims rely on the allegation that Elvig complained of the sexual harassment but Nelson, the church, and the presbytery failed to take the appropriate remedial action and instead placed her on unpaid leave, discharged her, and then prohibited her from seeking employment elsewhere. The respondents claim they took the proper steps when they received Elvig's complaint, but the evidence did not support her claims and no further action was necessary. They also argue that Elvig voluntarily left the church and that they cannot permit her to seek other work as long as her claims are pending. The respondents support their arguments by referring to Presbyterian Church rules.

---

[11] *Bollard v. Cal. Province of Soc'y of Jesus*, 196 F.3d 940, 944 (9th Cir. 1999).

[12] *Id.*

[13] 103 Wn. App. 160, 10 P.3d 435 (2000), *review denied*, 142 Wn.2d 1026 (2001).

[14] *Id.* at 166 (quoting *Rayburn v. Gen. Conference of Seventh-Day Adventists*, 772 F.2d 1164, 1169 (4th Cir. 1985), *cert. denied*, 478 U.S. 1020 (1986)).

[15] It is undisputed that the Presbyterian Church is a hierarchically-structured church.

The Presbyterian Church is governed by its *Book of Order* which outlines the form of church government, the church's theology, and the member discipline and conflict resolution processes. The *Book of Order*'s "Rules of Discipline" section encourages people to attempt to resolve their disputes among themselves through conciliation and mediation. If this resolution is not possible, disputes are to be resolved according to the judicial process outlined by the *Book of Order*. First, the complainant must submit a written statement of the alleged offense, along with supporting information, to the appropriate church official. The official then refers the complaint to an Investigating Committee. This Committee examines all relevant documents and interviews all relevant witnesses before determining whether charges should be filed.

If the Committee recommends filing charges, the Prosecuting Committee prosecutes the case on the church's behalf and a Permanent Judicial Commission conducts a formal trial. But if the Committee does not recommend filing charges, the complainant may appeal to the Permanent Judicial Commission. If the Commission sustains the appeal, a new Investigating Committee is appointed. But if it does not, the matter is concluded. In Elvig's case, an Investigating Committee conducted an inquiry and unanimously determined that charges would not be filed against Ackles. The Permanent Judicial Commission concurred, thus concluding the case.

The *Book of Order* also dictates how ministers are to be discharged. Only the presbytery, upon the congregation's recommendation, may dissolve a relationship between the pastor and the church. And a minister may not seek employment from another congregation without a Certificate of Transfer. According to the *Book of Order*, a presbytery may not issue a Certificate of Transfer if charges are pending.

Here, Elvig's case centers on the claim that church authorities learned of the sexual harassment but failed to discipline Ackles and instead precluded Elvig from seeking

other work. But the church declined to discipline Ackles because its Investigating Committee and Permanent Judicial Commission decided that insufficient evidence existed to file a charge. And the church's *Book of Order* prohibits allowing a minister to transfer while charges are pending. Thus Elvig's negligent supervision and aiding and abetting claims would require a secular court to examine decisions made by ecclesiastical judicial bodies, and her retaliation claims would require a court to question and interpret the transfer rule in the church's *Book of Order.* We can do neither without effectively undermining the church's inherent autonomy.

We thus affirm the trial court's order dismissing Elvig's claims against Nelson, the church, and the presbytery. We must also affirm the ruling dismissing Elvig's sexual harassment, retaliation, and aiding and abetting claims against Ackles. It would be counterintuitive to hold that a court may not interfere with church doctrine and ecclesiastical decision-making but that it may examine claims made against individual religious authorities. Were we to do so, we would be permitting civil authorities to question and interpret church doctrine as surely as if we had allowed the suit to proceed against the church itself.

Our ruling is a narrow one based on the court's inability to question or interpret the Presbyterian Church's self-governance. As such, we are not deciding whether the religious exemption in Washington's Law Against Discrimination (WLAD), chapter 49.60 RCW, is constitutional, nor are we deciding whether WLAD's provisions impose liability on individuals who acted on a religious organization's behalf. Nor are we determining what, if any, limitations are imposed on a *lay* plaintiff who seeks to sue a church or church authorities. And finally, we are not deciding whether a plaintiff may institute a civil action against a church or church authorities for criminal conduct.

As we noted above, the Ninth Circuit Court of Appeals reversed the federal district court in a two-to-one opinion, allowing Elvig's suit to proceed in federal court. After

reviewing that decision, we have concluded this case is distinguishable from the federal case. In the federal case, the Ninth Circuit held that the ministerial exception barred Elvig's Title VII sexual harassment and retaliation claims to the extent that they required an inquiry into the church's decision to terminate Elvig's ministry.[16] But it ruled that a civil court could still adjudicate those aspects of Elvig's sexual harassment claim involving allegations that Ackles harassed her and the church failed to intervene.[17] Similarly, the majority held Elvig's retaliation claim could also proceed, but only to the extent that it alleged verbal abuse and intimidation.[18]

What distinguishes our case from the federal case is the procedural posture in which we and they reviewed the case. The federal court was presented with an appeal from a motion for judgment on the pleadings,[19] while we are reviewing a motion for summary judgment. Thus, unlike the Ninth Circuit, we are able to consider the substantive evidence presented—particularly the evidence pertaining to the church's dispute resolution process as mandated by its *Book of Order*.

In fact, the dissenting opinion in the Ninth Circuit notes that because the church's adjudicatory process is mandated by the *Book of Order*'s Rules of Discipline, it is not simply an " 'internal grievance procedure' " but rather "is inextricably intertwined with the Church's religious tenants [sic] and is in actuality an integral aspect of its ecclesiastical mission."[20] Thus the dissenting judge was concerned that allowing Elvig's claim to proceed would compel the church

> to defend as reasonable its formal internal processing and handling of an ordained minister's sexual harassment and retaliation claims against another ordained minister and their

---

[16] *Elvig*, 375 F.3d at 958.

[17] *Id.* at 959-64.

[18] *Id.* at 965.

[19] *Id.* at 954.

[20] *Id.* at 973.

Church[.] . . . *A secular federal court jury has been given the authority to invade, to evaluate, and to overrule the Presbyterian Church's final judgment to which the Church says the plaintiff was bound to accept by her religious vows. . . .*[21]

The majority opinion responded to this concern by stating that because its review was limited to the pleadings, the dissent's factual recitation of church doctrine is "speculative prejudgment of what evidence may be produced or found relevant on a summary judgment motion or at any trial that may be warranted . . . .]"[22]

Unlike the Ninth Circuit, we are not reviewing a judgment on the pleadings and are able to consider that a civil court could not adjudicate Elvig's claims without inappropriately examining decisions made by ecclesiastical judicial bodies and interpreting rules pronounced in the *Book of Order*. Like the dissent in the Ninth Circuit case, we conclude that the courts cannot adjudicate Elvig's claims without second-guessing church doctrine and its interpretation.

We affirm.[23]

ELLINGTON, A.C.J., and BAKER, J., concur.

---

[21] *Id.* at 970 (emphasis added). In her vows, Elvig agreed to accept the Presbytery's judgment in matters such as this.

[22] *Id.* at 969.

[23] Elvig requests attorney fees on appeal. But because we affirm the trial court, Elvig is not the prevailing party and she is not entitled to attorney fees.